BRIAN M. BOYNTON
Acting Assistant Attorney General
Civil Division
ARUN G. RAO
Deputy Assistant Attorney General
GUSTAV W. EYLER
Director
Consumer Protection Branch
LISA K. HSIAO
Assistant Director
MARCUS P. SMITH
Trial Attorney
Consumer Protection Branch
U.S. Department of Justice
P.O. Box 386
Washington, DC 20044
(202) 353-9712
marcus.p.smith@usdoj.gov

Attorneys for Plaintiff United States of America

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>Plaintiff,<br><br>v.<br><br>**BURGERIM GROUP USA, INC.,**<br><br>**BURGERIM GROUP, INC.,**<br><br>and<br><br>**OREN LONI,** individually and as an officer of Burgerim Group USA, Inc. and Burgerim Group, Inc.**,**<br><br>Defendants. | No. 2:22-CV-825<br><br>**COMPLAINT FOR PERMANENT INJUNCTION AND MONETARY JUDGMENTS FOR CIVIL PENALTIES AND CONSUMER REDRESS, AND OTHER RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff, the United States of America, acting upon notification and authorization to the Attorney General by the Federal Trade Commission ("FTC"), pursuant to Section 16(a)(1) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 56(a)(1), for its Complaint alleges:

1. Plaintiff brings this action under Sections 5(a), 5(m)(1)(A), 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(a), 45(m)(1)(A), 53(b), 56(a), 57b, and the FTC's Trade Regulation Rule entitled "Disclosure Requirements and Prohibitions Concerning Franchising," as amended (the "Franchise Rule" or "the Rule"), 16 C.F.R. Part 436, for permanent injunctive relief, monetary relief, civil penalties, and other relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and the Franchise Rule, 16 C.F.R. Part 436.

## SUMMARY

2. Defendants lure would-be entrepreneurs into paying tens of thousands of dollars to open a burger franchise under the trade name "Burgerim." These franchises require a large upfront investment. Purchasers included veterans and people with different backgrounds and business experiences. Many purchasers relied on obtaining loans for tens of thousands of dollars to fund their franchise. Defendants, however, glossed over the risks of these hefty investments, touting the franchise as a "business in a box," and purporting to offer refunds in the event franchisees could not open the restaurant.

3. The Franchise Rule was designed to help prospective entrepreneurs evaluate the risks and benefits of a franchise opportunity with a disclosure document. In marketing and selling Burgerim franchises, Defendants fell woefully short of complying with the Rule. Left out of Defendants' disclosure document was the information necessary to enable prospective franchisees to analyze earning repre-

sentations or to get unvarnished experiences from prior purchasers. Worse, Defendants muddied the waters by making representations in their disclosure document that contradicted other statements they made to the prospective franchisees.

4. Defendants sold more than 1,500 Burgerim franchises, but the overwhelming majority of Burgerim franchisees never got their businesses off the ground. Hundreds sought to cancel their franchise agreements. In many cases, Defendants did not honor their promises to provide refunds, and in this scheme, have bilked aspiring business owners out of millions of dollars.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a), 1345, and 1355, and 15 U.S.C. § 53(b). This action arises under 15 U.S.C. § 45(a).

6. Venue is proper in this District under 28 U.S.C. §§ 1391(b)-(d) and 1395(a), and 15 U.S.C. § 53(b).

## SECTION 5 OF THE FTC ACT

7. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

8. Misrepresentations of material facts constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

## THE FRANCHISE RULE

9. The Franchise Rule defines a "franchise" as any continuing commercial relationship or arrangement, whatever it may be called, in which the terms of the offer or contract specify, or the franchise seller promises or represents, orally or in writing, that:

    a) The franchisee will obtain the right to operate a business that is identified or associated with the franchisor's trademark, or to offer, sell, or distribute goods, services, or commodities that are identified or associated with the franchisor's trademark;

3

b) The franchisor will exert or has authority to exert a significant degree of control over the franchisee's method of operation, or to provide significant assistance in the franchisee's method of operation; and

c) As a condition of obtaining or commencing operation of the franchise, the franchisee makes a required payment or commits to make a required payment to the franchisor or its affiliate. 16 C.F.R. § 436.1(h).

10.   Under the Franchise Rule, a "franchise seller" is a person that offers for sale, sells, or arranges for the sale of a franchise. The term encompasses the franchisor and the franchisor's employees, representatives, agents, subfranchisors, and third-party brokers who are involved in franchise sales activities. It does not include existing franchisees who sell only their own outlet and who are otherwise not engaged in franchise sales on behalf of the franchisor. 16 C.F.R. § 436.1(j).

11.   A "franchisor" means any person who grants a franchise and participates in the franchise relationship. Unless otherwise stated, it includes sub franchisors. For purposes of this definition, a "subfranchisor" means a person who functions as a franchisor by engaging in both pre-sale activities and post-sale performance. 16 C.F.R. § 436.1(k).

12.   The Franchise Rule requires a franchisor to provide prospective franchisees with a basic Franchise Disclosure Document ("FDD") containing twenty-three categories (or "Items") of information, including information about: the franchisor and its affiliates (Item 1); prior or pending litigation (Item 3); the initial fee paid by franchisees, including conditions under which the fee is refundable (Item 5); franchisee obligations to purchase or lease goods and services from designated suppliers and payments to the franchisor from such suppliers based on those purchases (Item 8); franchise endorsement by public figures (Item 18); the assistance provided by the franchisor (Item 11); and statistical information on the number of

company-owned and franchisee-owned outlets in the franchisor's system, including the names, addresses, and telephone numbers of existing franchisees (Item 20). 16 C.F.R. § 436.5(a)-(w).

13. The FDD must be current (16 C.F.R. § 436.2(a)) and marked with an issuance date (16 C.F.R. § 436.3(e)(6)). Additional disclosures are required if the franchisor elects to make any financial performance representations, such as including those financial performance representations in Item 19 of the franchisor's FDD, among other things. 16 C.F.R. § 436.9(c). Franchise sellers are prohibited from making any representations that contradict the information required to be disclosed in the FDD. 16 C.F.R. § 436.9(a).

14. Pursuant to Section 18(d)(3) of the FTC Act, 15 U.S.C. 57a(d)(3), and subparts B, D, and F, 16 C.F.R. § 436.2, § 436.6(a), and § 436.9, violations of the Franchise Rule constitute unfair or deceptive acts or practices in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

15. Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A), as modified by Section 4 of the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461, the Federal Civil Penalties Inflation Adjustment Act of 2015, Public Law 114-74, sec. 701, 129 Stat. 599 (2015), and Section 1.98(d) of the FTC's Rule of Practice, 16 C.F.R. § 1.98(d), authorizes this Court to award monetary civil penalties of not more than $46,517 for each violation of the Franchise Rule assessed after January 10, 2022, including penalties whose associated violation predated January 10, 2022, that is made with actual knowledge or knowledge fairly implied on the basis of objective circumstances that such act is unfair or deceptive and is prohibited by such rule.

## DEFENDANTS

16. Defendant Burgerim Group USA, Inc. ("BIMGUSA") is a California corporation with its principal place of business at 23945 Calabasas Road, Calabasas, California 91302. BIMGUSA sells burger restaurant franchises under the

trade name "Burgerim." BIMGUSA transacts or has transacted business in this District and throughout the United States. At all times relevant to this Complaint, acting alone or in concert with others, BIMGUSA has advertised, marketed, distributed or sold Burgerim franchises to consumers throughout the United States.

17. Defendant Burgerim Group, Inc. ("BIMG") is a Delaware corporation with its principal place of business at 23945 Calabasas Road, Calabasas, California 91302. BIMG transacts or has transacted business in this District and throughout the United States. Since 2019, BIMG, acting alone or in concert with others, has advertised, marketed, distributed or sold Burgerim franchises to consumers throughout the United States.

18. Defendant Oren Loni ("Loni") was at all relevant times the chief executive officer of BIMGUSA and BIMG (collectively, "Corporate Defendants"). Acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Corporate Defendants, including the acts and practices set forth in this Complaint. Loni has advertised, marketed, distributed or sold Burgerim franchises to consumers throughout the United States. At all times material to this Complaint, Loni formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Corporate Defendants. Loni has been a signatory on BIMGUSA and BIMG bank accounts, communicated with prospective and existing franchisees about the Burgerim franchise opportunity, entered into agreements, and negotiated contracts with franchisees. In connection with the matters alleged herein, Loni transacts or has transacted business in this District and throughout the United States.

## COMMON ENTERPRISE

19. Defendants BIMGUSA and BIMG have operated as a common enterprise while engaging in the deceptive and unlawful acts and other violations of law alleged below. BIMGUSA was incorporated in California in October 2014 with its initial principal place of business at 16861 Ventura Boulevard, Suite 303, Encino,

California 91436. BIMG was incorporated in Delaware in June 2019 with its principal place of business at the same address. On September 4, 2019, pursuant to California Corporations Code sections 201(b) and 2106(b), and California Code of Regulations sections 21003-21004, Oren Loni, as CEO of BIMGUSA, granted permission to BIMG to do business in California under that name. Since at least August 2019, BIMG has participated in the operation of the Burgerim franchise business, including, but not limited to, communicating with and managing the business relationships with BIMGUSA franchisees, enforcing agreements entered into by BIMGUSA and its franchisees; receiving rebate payments sent to BIMGUSA under agreements with product and service suppliers; and making payments to employees or former employees of BIMGUSA.

20. Corporate Defendants have conducted the business practices described below through interrelated companies that have common management; coordinated business functions; shared office space, employees and resources; shared revenues, and comingled funds. Because these Corporate Defendants have operated as a common enterprise, each of them is liable for the acts and practices as alleged below.

## COMMERCE

21. At all times relevant to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' BUSINESS ACTIVITIES

22. Since at least 2016, Defendants BIMGUSA and Oren Loni, and since 2019, Defendant BIMG, have offered and sold franchises of Burgerim, a fast-casual restaurant specializing in multiple types of hamburgers.

23. For those interested in opening a Burgerim franchise, the investment of time and money is quite substantial. In many instances, franchisees paid De-

fendants a franchise fee between $50,000 and $70,000 for a single franchise location. In many instances, Defendants offered incentives to purchase more than one Burgerim franchise, such as a discounted franchise fee of $40,000 per franchise. To secure the money to pay the franchise fees, many prospective franchisees have sought and taken out loans backed by the Small Business Administration or a commercial bank lender.

24. Defendants have targeted military veterans, recruiting them to the franchise by offering them, in many instances, a $10,000 to $15,000 discount off the franchise fee for a single Burgerim franchise. In many instances, Defendants have incentivized veterans to purchase more than one location by offering a discount to veterans who purchased multiple locations.

25. In exchange for the franchise fee, Defendants provided franchisees the right to establish and operate a Burgerim restaurant. The fee does not include other costs of opening or operating the franchise, such as securing a location, building out the restaurant, outfitting it with necessary equipment, and obtaining products and supplies. Defendants have estimated that it may cost franchisees more than $600,000 to begin operation of a Burgerim franchise.

26. Defendants control the franchise operations by, among other things, approving sites for Burgerim restaurant locations, imposing building design specifications, and requiring franchisees to sell specific items, use certain equipment, and purchase only approved products and supplies.

27. Franchisees who paid Defendants the franchise fee come from different backgrounds and business experiences. In many instances, Burgerim franchisees had no prior experience running a restaurant before signing up to be a Burgerim franchisee.

28. Defendants make it a point to undersell the risks and difficulties of opening a franchise. In their online and in-person marketing, Defendants represent

that their franchise is a "business in a box," which prospective franchisees do not need any prior business experience to operate.

29. Anticipating that inexperienced franchisees may be intimidated by the process, Defendants represent they will assist franchisees every step of the way. For example, Defendants represent in the Burgerim "Brand Book," which they provide to prospective franchisees, that "…[o]ur Burgerim Team walks you through the entire process of becoming a restaurateur [sic]." The Brand Book also states, among other things, that Defendants will assist franchisees with "locking in a prime location" for their restaurant, obtaining financing, and "acquiring the architect and contractors, as well as the different licenses needed to open the restaurant." Defendants also promise to provide ongoing support to franchisees.

30. Defendants also make the following representations on their website, www.burgerim.com:

- "All you need is the will to succeed. Our international fast food franchising team paves the way for you to become a thriving business owner. We'll help you customize your location, hire a small team, and generate wealth."
- "Burgerim's experienced global team has conducted extensive research into the US fast casual dining market and has developed training, branding and operations protocols designed to empower franchise owners and support them in operating successful and profitable Burgerim stores in their communities."

31. In many instances, throughout the sales process, Defendants have pitched prospective franchisees on the financial performance of their franchise opportunity. Defendants have made verbal representations about the financial performance of existing locations and prospective franchisees' likely performance, such as estimates for weekly or monthly sales figures and break-even points. For example, a Burgerim representative told one franchisee that the break-even point for

open Burgerim stores was $50,000 per month and that they were all hitting that number in two weeks or sooner.

32. Further downplaying the financial risk of paying the franchise fees, in many instances, Defendants, verbally or in writing, have represented to prospective and existing franchisees that if they were unable to obtain financing or secure a restaurant location, Defendants would refund the prospective franchisees their franchise fees. In some instances, Defendants entered into written refund and cancellation agreements with existing franchisees whereby Defendants agreed to provide a refund of the franchise fees. In exchange, the franchisees agreed, among other things, not to disparage Defendants.

33. For many franchisees who paid franchise fees to Burgerim, Defendants' promises were illusory. In numerous instances, franchisees could not secure the financing necessary to pay necessary costs, such as conducting the build out of the restaurant to the specifications demanded by Defendants. Other franchisees could not secure a restaurant location.

34. In many cases, Defendants did not provide the promised refunds to franchisees who requested one. Even franchisees who persisted with repeated requests spanning several months often were unable to obtain a refund. For example, some franchisees who were unable to secure financing, and had a signed letter from Oren Loni promising that Burgerim would refund their franchise fee under such circumstances, spent more than a year trying to get their money back to no avail. Ultimately, a Burgerim representative told them that in order to get their money back, they would have to sign a new document, which included a non-disparagement clause and other obligations.

35. Since 2017 Burgerim has sold more than 1,500 franchises across the United States, for which Defendants received tens of millions of dollars. Despite Defendants receiving franchise fee payments from prospective franchisees for the right to open a Burgerim franchise, the majority of those franchises never opened.

36.     In addition to their misrepresentations and broken promises, Defendants withheld material information required by the Franchise Rule. The Franchise Rule requires franchisors to provide aspiring entrepreneurs with a FDD containing certain mandatory disclosures, a key purpose of which is to enable prospective franchisees to assess the risks of the paying the franchise fee and entering into a franchise agreement.

37.     For example, in numerous instances, Defendants' FDDs did not include in Item 2 the name and position of the franchisor's principals or any other individuals who would have management responsibility relating to the sale or operation of the franchises, impeding prospective franchisees from conducting appropriate due diligence.

38.     Defendants' FDDs, in numerous instances, did not provide contact information for prior purchasers as required in Item 20, impeding prospective franchisees from contacting other franchisees and learning about their experiences with Defendants.

39.     Defendants failed to include in Item 19 of the FDDs, the verbal financial performance representations they provided to prospective franchisees. In fact, Defendants not only failed to include this required information, they contradicted their verbal representations by stating in the FDDs that no such representations had been made.

40.     Despite Defendants' representations that under certain conditions they would refund the franchisees' franchise fees, in numerous instances, Item 5 of Defendants' FDDs did not identify all such conditions. In fact, not only did Defendants fail to include all such conditions, but in certain instances, the FDDs contradicted Defendants' own representations by stating the franchise fee was non-refundable.

41.     Defendants' unlawful activities have harmed people across the country. Many franchisees find themselves crushed by substantial debt or ruined credit,

in addition to the time and effort they exerted to make their entrepreneurial aspirations a reality.

42. In early 2020, the Maryland Attorney General's office, the Washington Department of Financial Institutions, and Indiana's Secretary of State each issued orders against BIMGUSA that prohibit it from selling franchises in their respective states based upon various violations of their respective state franchise laws. In addition, in February 2021, the Commissioner of Financial Protection and Innovation for the State of California issued a citation and cease and desist order against Defendants for injunctive and monetary relief for violations of California law.

43. Defendants continue to advertise the Burgerim franchise opportunity on their website, burgerim.com.

44. Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendants continue to violate or are about to violate laws enforced by the Commission.

## **VIOLATIONS OF SECTION 5 OF FTC ACT**
### COUNT I

45. Paragraphs 1-44 are incorporated as if set forth herein.

46. In numerous instances in connection with the advertising, marketing, promotion, offering for sale, or sale of Burgerim franchises, Defendants have made false or misleading representations of material facts to franchisees.

47. For example, Burgerim represented directly, or indirectly, expressly or by implication, that it will provide a refund of the franchise fee to franchisees who are unable to secure financing or a restaurant location. In fact, in numerous instances where Defendants represented that Burgerim would provide a refund of the franchise fee to franchisees who were unable to secure financing or a restaurant location, Defendants did not refund the franchise fee.

48. Therefore, Defendants have made false or misleading representations of material facts that constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act.

## **VIOLATIONS OF THE FRANCHISE RULE**

## COUNT II

### Disclosure Violations

49. Paragraphs 1-48 are incorporated as if set forth herein.

50. The Burgerim opportunity sold by Defendants is a "franchise" pursuant to the Franchise Rule.

51. Defendants are "franchise sellers" pursuant to the Franchise Rule.

52. Defendants are "franchisors" pursuant to the Franchise Rule.

53. In many instances, Defendants furnish prospective franchisees with disclosures that fail to comply with the FTC's Franchise Rule's disclosure requirements.

54. Defendants had knowledge of the requirements of the Franchise Rule as evidenced by the fact that they provided an FDD to prospective franchisees.

55. In connection with the offering for sale and sale of franchises, as "franchise" is defined in 16 C.F.R. § 436.1(h), in many instances, Defendants furnish prospective franchisees with FDDs that fail to: (1) include all of the information required by the Franchise Rule, 16 C.F.R. § 436.5 and (2) follow the instructions for preparing disclosure documents set forth in 16 C.F.R. §§ 436.3 and 436.6 of the Franchise Rule. For example, in certain instances Defendants failed to disclose the following:

  a) the issuance date of each FDD (16 C.F.R. § 436.3(e)(6));

  b) the name and principal business address of any affiliates that offer franchises in any line of business (Item 1) (16 C.F.R. § 436.5(a)(1));

    c) the prior business experience of any affiliates that offer any franchises in any line of business (Item 1) (16 C.F.R. § 436.5(a)(7));

    d) the name and position of the franchisor's directors, trustees, general partners, principal officers, and any other individuals who will have management responsibility relating to the sale or operation of the franchises (Item 2) (16 C.F.R. § 436.5(b));

    e) any conditions under which the initial fees are refundable (Item 5) (16 C.F.R. § 436.5(e));

    f) information regarding the revenue the franchisor received from required purchases or leases by franchisees (Item 8) (16 C.F.R. § 436.5(h)(6)); and

    g) the telephone numbers of each current franchisee's outlets, and the name, city and state, and current business telephone number or, if unknown, the last known home telephone number of every franchisee who voluntarily or involuntarily ceased to do business under the franchise agreement during the most recently completed fiscal year or who has not communicated with the franchisor within 10 weeks of the disclosure document issuance date (Item 20) (16 C.F.R. § 436.5(t)(4)-(5)).

56. Therefore, Defendants have violated subpart C, 16 C.F.R. §§ 436.3, 436.5, and subpart D, 16 C.F.R. § 436.6, of the Franchise Rule with the knowledge required by Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A).

## COUNT III

<u>Dissemination of Financial Performance Representations Not Included in FDD</u>

57. Paragraphs 1-56 are incorporated as if set forth herein.

58. Section 436.9(c) of the Franchise Rule, 16 C.F.R. § 436.9(c), requires a franchisor to include any and all financial performance representations in Item 19 of the franchisor's FDD.

59. In connection with the offering for sale and sale of franchises, as "franchise" is defined in section 436.1(h) of the Franchise Rule, Defendants disseminated financial performance representations to prospective franchisees while failing to include those representations in Item 19 of Defendant BIMGUSA's FDD and failing to provide the other information and statements as required by Section 436.9(c) of the Franchise Rule.

60. Therefore, Defendants have violated section 436.9(c) of the Franchise Rule, 16 C.F.R. § 436.9(c) and Section 5(a) of the FTC Act with the knowledge required by Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A).

## COUNT IV

### Claims or Representations that Contradict a Required Disclosure

61. Paragraphs 1-60 are incorporated as if set forth herein.

62. Section 436.9(a) of the Franchise Rule, 16 C.F.R. § 436.9(a), prohibits a franchisor from making any claim or representation orally, visually, or in writing that contradicts the information required to be disclosed by the Franchise Rule.

63. In connection with the offering for sale and sale of franchises, as "franchise" is defined in Section 436.1(h) of the Franchise Rule, Defendants made numerous representations contradicting disclosures made in their FDD, including but not limited to making representations to prospective or existing franchisees:

   a) that they could obtain refunds, in certain circumstances, of their franchise fees;
   b) regarding the financial performance of already-open franchise locations and the income (gross and net) that prospective franchisees could expect to make; and
   c) regarding Defendants' obligations to provide assistance in identifying a location, obtaining financing, constructing, and remodeling the franchise premises.

64. Therefore, Defendants have violated Section 436.9(a) of the Franchise Rule, 16 C.F.R. § 436.9(a), and Section 5(a) of the FTC Act with the knowledge required by Section 5(m)(1)(A) of the FTC Act, 15 U.S.C. § 45(m)(1)(A).

## CONSUMER INJURY

65. Consumers have suffered or will suffer substantial monetary loss as a result of Defendants' violation of the Franchise Rule and the FTC Act. Absent injunctive relief by the Court, Defendants are likely to continue to injure consumers and harm the public interest in the offer and sale of franchises.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court:

A. Enter a permanent injunction to prevent future violations of the FTC Act and Franchise Rule by Defendants;

B. Award monetary and other equitable relief within the Court's power to grant;

C. Award Plaintiff monetary civil penalties from each Defendant for every violation of the Franchise Rule; and

D. Award any additional relief as the Court determines to be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated:  February 7, 2022

Respectfully submitted,

**FOR FEDERAL TRADE COMMISSION:**

Christine M. Todaro
Christopher E. Brown
Attorneys
Federal Trade Commission
Washington, DC 20580
202-326-3711 (Todaro)
202-326-2825 (Brown)
202-326- 3395 (fax)
ctodaro@ftc.gov
cbrown3@ftc.gov

**FOR PLAINTIFF THE UNITED STATES OF AMERICA:**

BRIAN M. BOYNTON
Acting Assistant Attorney General
Civil Division

ARUN G. RAO
Deputy Assistant Attorney General

GUSTAV W. EYLER
Director
Consumer Protection Branch

LISA K. HSIAO
Assistant Director

By: /s/ *Marcus P. Smith*
Marcus P. Smith
Trial Attorney
Consumer Protection Branch
U.S. Department of Justice
P.O. Box 386
Washington, DC 20044
(202) 353-9712
marcus.p.smith@usdoj.gov